Harsha, J.
*497 {¶ 1} After a jury convicted John F. Wright of three drug offenses, the trial court sentenced him to prison. Wright raises six assignments of error but we address only the fifth one because that review renders the remaining errors moot.
{¶ 2} Wright asserts because the pills introduced into evidence were not properly tested, the trial court committed reversible error in denying his motion to exclude them as evidence. We agree. The state's expert witness, a forensic scientist, testified that he did not test a sample size large enough to determine the content of the remaining pills with a reasonable degree of scientific certainty. Thus, the remaining pills should have been excluded from evidence. We reverse the trial court's judgment and remand for a new trial.
I. FACTS
{¶ 3} In 2015, a Lawrence County Grand Jury indicted Wright on one count of complicity to aggravated trafficking in drugs in violation of R.C. 2923.03(A)(2) and R.C. 2925.03(A)(1)(C)(1)(d), a second degree felony; one count of trafficking in drugs in violation of R.C. 2925.03(A)(2)(C)(1)(c), a third degree felony; and one count of possession of drugs in violation of R.C. 2925.11(A)(C)(1)(b), a third degree felony.[1]
{¶ 4} At trial the state presented three law enforcement officers who testified about a controlled drug buy where a confidential informant used marked money to purchase oxycodone, a schedule II controlled substance, from Wright. The confidential informant and a woman who assisted Wright during the drug buy also testified about their roles.
{¶ 5} Laura Miller, a grocery store pharmacist, testified that Wright had a prescription for oxycodone and that the prescription drug bottle recovered from Wright after the controlled drug buy was one that she filled. Miller testified that the oxycodone tablets she had provided were 15 mg, green, round, and marked "K8". Miller testified that if the pills in the prescription bottle were marked "A214" instead of "K8", then they would not be the oxycodone pills she used to fill Wright's prescription.
{¶ 6} Stanton Wheasler, a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"), testified that he tested the pills and prepared a written report. Wheasler indicated that the evidence consisted of a prescription bottle of 98 pills marked "A214" and a plastic bag containing 95 pills with five different markings: (1) 63 pills marked "M30"; (2) 21 pills marked "A215"; (3) 1 pill marked "224"; (4) 7 pills marked "K8"; (5) 3 pills marked "A214". Wheasler tested six pills in total, one pill from each differently marked group. Wheasler testified that for marked pharmaceuticals, his standard protocol is to test one pill per marked group. Each of the six pills he tested contained oxycodone. Wright testified that after testing one of *498 each marked group of the 95 pills and finding it contained oxycodone, it would be reasonable to infer that the remaining pills in the group also contained oxycodone. However, Wheasler did not testify that he personally made this inference or that he made this inference with a reasonable degree of scientific certainty:
Q. And that's the total of ninety five. And is it your opinion based upon testing one of each that these ninety five pills contained oxycodone?
A. It's my opinion that the five I tested contained oxycodone.
Q. Go ahead.
A. It would be a reasonable inference that um, the remaining ones did as well.
{¶ 7} Wheasler testified that when he tested one of the 98 pills marked "A214" that were in the prescription drug bottle, it contained oxycodone. The state asked him about the inference that could be drawn from that test:
A. That is [sic] was 98 round green tablets marked A214. Which had a reference strength of 15 milligrams of which I tested one. Weighing .10 gram plus or minus 1.04 gram. It was found to contain oxycodone.
Q. And can that lead you to by inference by a reasonable degree of scientific certainty that, all ninety eight were oxycodone's [sic]?
A. That would be in the inference that could be made, yes.
{¶ 8} Although Wheasler stated that an inference about the remaining 97 pills could be made, he clarified that he did not make that inference because he did not test a sufficient number of pills to be able to make the inference with a reasonable degree of scientific certainty.
{¶ 9} In response to questioning from the trial judge, Wheasler testified that he has a reasonable degree of scientific certainty that the six pills he tested were oxycodone, and that it would be unlikely that the remaining pills were not oxycodone. Wheasler testified that he would need to sample a larger population of the pills to make an inference with a reasonable degree of scientific certainty about the remaining untested pills:
A. * * * in order for me to make an inference about a population, the rule in my laboratory is that I have to test a um, statistically back sampling plan of that population, which means I have to test, um, for example in the case of, um, sixty three tablets I'd probably be testing somewhere around twenty of them. * * * and that would be for anything. That would be for demos of heroin, that would be for bags of marijuana. That would be the number I'd have to test to be allowed to infer um, about the entire population. Um, here all I can say is that the one's I tested had oxycodone in them. And they were stored with tablets that were visually identical to me.
COURT: To a degree of scientific certainty?
A. I don't know if I am allowed to have scientific certainty about simply visual examination.
COURT: Alright, that's not something you express an opinion in that form?
A. Yes.
{¶ 10} On re-direct and re-cross, Wheasler explained that the accrediting body imposed requirements on inference populations. When he tests a single pill from a population of marked pills, he cannot use the reasonable degree of scientific certainty standard on the entire population of pills. In order to give an opinion within a reasonable degree of scientific certainty, he would have to test a larger sample to establish a confidence interval. Wheasler testified that for the 63 pills marked *499 "M30", he would need to test approximately 20 pills using "the hypergeometric function" to establish a 95% confidence level that at least 90 percent of the pills in the sample are oxycodone.
{¶ 11} Wheasler's lab report states, "Hypergeometric sampling may be specified in the findings above. The application of hypergeometric sampling establishes a ninety-five percent (95) confidence level that at least ninety percent (90) of the units in the sample are as reported." Wheasler's report was consistent with Wheasler's testimony that only six pills were tested and found to contain oxycodone, three pills with a referenced strength of 30 mg and three pills with a referenced strength of 15 mg. Thus, Wheasler's report identified a total 135 mg of oxycodone. And Wheasler's testimony was that his sample population was insufficient for him to draw inferences about the substance of the remaining pills with a reasonable degree of scientific certainty.
{¶ 12} Wheasler testified that he has had experience with counterfeit marked pills and cannot tell with one-hundred-percent certainty which pills are counterfeit. Wheasler testified that by testing six pills, he did not test enough pills to find enough oxycodone in them to exceed the bulk amount of five times the maximum does of oxycodone :
A. That is correct, I have not with actual analysis positively identified oxycodone in tablets over five times the bulk amount.
{¶ 13} Wheasler testified that it is standard lab protocol to test one of each differently marked group of pills. He visually inspects the remaining untested pills and will test additional pills if they appear to be counterfeit. Counterfeit pills often have a different appearance and may be crumbly, sloppy, different coloring, and varying thicknesses. Wheasler testified that none of the pills he tested here had counterfeit characteristics and they appeared to be legitimate pharmaceuticals. However, because he did not test an adequate sample of the remaining pills, he could not say within a reasonable degree of scientific certainty that they were oxycodone:
Q. Right, is it right to say within a reasonable degree of certainty to say the six you tested were oxycodone, correct?
A. Correct.
Q. And the remainder you can't say within a reasonable degree of scientific certainty, correct?
A. The [sic] is the way crediting body would phrase that, yes.
{¶ 14} Following the second day of trial Wright moved to exclude the pills from evidence based on Wheasler's inability to testify about the content of the remaining pills with a reasonable degree of scientific certainty. Wright argued that the particular charge requires the state to prove that Wright possessed or trafficked oxycodone in five but less than fifty times bulk. Wright argued that the state's evidence established that the six pills tested contained at most 180 mg (6 times 30 mg) of oxycodone-only twice the therapeutic amount of 90 mg whereas bulk is five times the therapeutic amount. Wright asked the court to exclude the evidence or to dismiss the case.
{¶ 15} At the close of the state's case Wright moved for a dismissal under Crim.R. 29 based on his motion to exclude the pills from evidence.[2] Wright argued that Crim.R. 29 provides for a dismissal of *500 the charges if the state has not met the prima facie elements of the case. Wright argued that based on Wheasler's testimony, the state provided evidence that six pills tested positive for 30 mg of oxycodone for a total of 180 mg of oxycodone. Wright argued whether the state has established a prima facie case is not a matter for the jury to evaluate. The trial court addressed Wright's motion to exclude evidence and motion for acquittal together and denied them on the ground that they were questions for the jury to determine.
{¶ 16} The jury found Wright guilty on all three counts (and a forfeiture specification). The trial court sentenced Wright to a combined ten-year prison term.
II. ASSIGNMENTS OF ERROR
{¶ 17} Wright assigns the following errors for our review:
I. THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION AND OTHERWISE COMMITTED REVERSIBLE ERROR IN REFUSING TO GRANT APPELLANT'S REQUEST, HAVING BEEN PREVIOUSLY DECLARED BY THE COURT TO BE INDIGENT, THAT THE STATE OF OHIO PAY FOR A VOICE RECOGNITION EXPERT TO ANALYZE THE VOICES ON ONE OF THE CELL PHONES RECOVERED BY LAW ENFORCEMENT AND TESTIFY AT TRIAL ON BEHALF OF APPELLANT, AS THE COURT ALLOWED THE AUDIO FROM ONE OF THE CELL PHONES TO BE ENTERED INTO EVIDENCE AT TRIAL AND USED BY THE STATE AGAINST THE APPELLANT, WHICH EXPERT TESTIMONY SOUGHT BY APPELLANT WOULD HAVE REVEALED THAT THE APPELLANT'S VOICE IS NOT ON EITHER OF THE RECOVERED CELL PHONES ENGAGING IN CRIMINAL ACTIVITY.
II. TRIAL COUNSELS' FAILURE TO CALL EXPERT WITNESSES, REBUTTAL WITNESSES, FACT WITNESSES, CHARACTER WITNESSES OR ANY WITNESSES AT ALL IN APPELLANT'S DEFENSE AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL TO SUCH EXTENT THAT THE APPELLANT WAS DEPRIVED OF A FAIR TRIAL AND, BUT FOR THE INEFFECTIVE ASSISTANCE OF COUNSEL, THE RESULT OF THE PROCEEDING BELOW WOULD HAVE BEEN DIFFERENT.
III. TRIAL COUNSELS' FAILURE TO FILE A FORMAL MOTION OR EVEN ORALLY MOVE THAT THE JUDGE RECUSE HIMSELF FROM PRESIDING OVER APPELLANT'S TRIAL, AND COUNSELS' FAILURE TO MOVE THAT THE LAWRENCE COUNTY, OHIO PROSECUTOR'S OFFICE RECUSE ITSELF OR BE DISQUALIFIED FROM TRYING THE CASE AGAINST THE APPELLANT, AMOUNTED TO REVERSIBLE ERROR AND IS OTHERWISE INEFFECTIVE ASSISTANCE OF COUNSEL TO SUCH EXTENT THAT THE APPELLANT WAS DEPRIVED OF A FAIR TRIAL CONSIDERING JUDGE W. CHARLES COOPER AND W. MACK
*501 ANDERSON, ESQ., ROBERT C. ANDERSON, ESQ. AND C. MICHAEL GLEICHAUF, ESQ., ALL OF WHOM ARE EMPLOYED AS ASSISTANT PROSECUTORS IN THE LAWRENCE COUNTY PROSECUTOR'S OFFICE, HAVE EACH PREVIOUSLY REPRESENTED THE APPELLANT IN JUVENILE AND/OR CRIMINAL CASES IN LAWRENCE COUNTY, OHIO THUS RAISING A CONFLICT OF INTEREST, OR AT LEAST A POTENTIAL CONFLICT OF INTEREST, TO SUCH EXTENT THAT VENUE SHOULD HAVE BEEN TRANSFERRED OR A VISITING JUDGE AND A SPECIAL PROSECUTOR ASSIGNED TO TRY APPELLANT'S CASE IN LAWRENCE COUNTY.
IV. THE SAME PILLS SEIZED AS EVIDENCE AND INTRODUCED BY THE STATE AT TRIAL ON EACH COUNT AGAINST THE APPELLANT SHOULD HAVE BEEN CONSIDERED BY THE LOWER COURT AS ALLIED OFFENSES AND, BY ALLOWING THE STATE TO USE THE SAME PILLS ON ALL THREE (3) COUNTS UNDER THE INDICTMENT, THE TRIAL COURT ABUSED ITS DISCRETION AND IS OTHERWISE REVERSIBLE ERROR.
V. THE PILLS SEIZED AS EVIDENCE AND INTRODUCED BY THE STATE AT TRIAL WERE NOT PROPERLY TESTED BY THE OHIO BUREAU OF CRIMINAL INVESTIGATION GIVEN THE NUMBER OF PILLS SEIZED WAS IN EXCESS OF NINETY (90) PILLS WHILE THE LIMITED NUMBER OF PILLS ACTUALLY TESTED BY THE STATE WAS ONLY SIX (6) PILLS, WHICH IS REVERSIBLE ERROR AS THE PERCENTAGE OF PILLS TESTED WAS LESS THAN THAT REQUIRED TO OBTAIN A STATISTICAL CONFIDENCE INTERVAL WITHIN A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY, AND IS OTHERWISE REVERSIBLE ERROR IN LIGHT OF THE OHIO SUPREME COURT'S RULING LAST MONTH IN STATE V. GONZALES, 150 OHIO ST.3D 261, 2016-OHIO-8319, 81 N.E.3D 405.
VI. THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION AND OTHERWISE COMMITTED REVERSIBLE ERROR BY SENTENCING THE APPELLANT TO THE MAXIMUM PRISON TERM OF EIGHT (8) YEARS ON HIS F-2 CONVICTION AS THE THREE (3) COUNTS UNDER THE INDICTMENT WERE ALLIED OFFENSES AND THE STATE USED THE SAME PILLS ON EACH COUNT TO CONVICT THE APPELLANT IN DIRECT CONFLICT WITH THE OHIO FOURTH DISTRICT COURT OF APPEALS RULING IN STATE VS. SMITH, 2016-OHIO-5062, 70 N.E.3D 150 (OHIO APP. 2016).
III. LAW AND ANALYSIS
A. Motion to Exclude Evidence
{¶ 18} In his fifth assignment of error Wright argues that because the pills were *502 not properly tested, the trial court erred when it failed to exclude them from evidence. Wright points out that Wheasler testified that he could not identify the statutory threshold of oxycodone with a reasonable degree of scientific certainty. Wright was unable to make an inference about the contents of the remaining untested pills with a reasonable degree of scientific certainty because he did not test a sufficient sample size. Therefore, Wright contends that the untested pills were improperly admitted and, with only six oxycodone pills, the state could not prove that the weight of the actual pills meets the statutory threshold for the charges against him. He argues the trial court committed reversible error when it denied his motion to exclude the pill evidence.
{¶ 19} At trial Wright filed a written motion to exclude evidence of the remaining pills on the morning after Wheasler testified. The parties agreed to argue the motion later in the day. At the close of the state's evidence Wright argued that the charges against him should be dismissed because the remaining untested pills should be excluded.
{¶ 20} Wright contended he did not raise an evidentiary objection sooner because he was not aware until the second day of trial that the state's forensic scientist, Stanton Wheasler, would testify that he did not test a sufficient sampling of pills to be able to identify the content of the remaining pills within a reasonable degree of scientific certainty. Wright argued that Wheasler also testified that there are counterfeit pills on the market and some are difficult to detect. Wright argued that the charges required the state to prove that the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount. Bulk amount is five times the therapeutic dosage of 90 mg, or 450 mg. Wright argued that state had to prove the drug equals or exceeds five times 450 mg, which is 2250 mg, but less than fifty times the bulk amount; thus the state needed an analysis that proved within a reasonable degree of scientific certainty that there was at least 2250 mg of oxycodone. Wright argued that the state only proved that six pills contained 30 mg of oxycodone, for a total of 180 mg.[3]
{¶ 21} The state responded that Wheasler testified that he follows protocol, works in an accredited lab and no one had complained about his work previously. It argued that this question should be a matter for the jury.
{¶ 22} In response Wright contended that he was not disputing that Wheasler worked in an accredited laboratory nor was he disputing that Wheasler followed the lab protocol when testing the six pills-the state had proven there were at most 180 mg of oxycodone. Wright argued that Wheasler acknowledged that the accreditation process required a testing sample size of at least twenty pills when the quantity of pills was this large and that Wheasler testified that he had not tested enough pills to identify the content of the remaining pills with a reasonable degree of scientific certainty.
{¶ 23} The trial court addressed both the Crim.R. 29 motion for acquittal and the motion to exclude evidence together and found that, setting aside the question of Wheasler's pill sampling method, the remainder of the evidence was sufficient to withstand a Rule 29 motion. Addressing the pill sampling method, the trial court found that Wheasler submitted both a written report and testified, the trial court did not have any evidence about statistical *503 sampling, and therefore the evidence would go to the jury:
* * * I can't consider um, you know what might be in statistical sampling's and, and what percentages to the degree of the universe are necessary. I feel like it is a, at this point, once his certification, his testimony and his opinion is in, in written form first and then orally then it's a jury question and I'll overrule both motions at this time.
1. Standard of Review
{¶ 24} "Decisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review." Estate of Johnson v. Randall Smith, Inc. , 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22, citing State v. Hancock , 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032 ; State v. Morris , 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19 ("It is well established that a trial court's decision to admit evidence is an evidentiary determination within the broad discretion of the trial court and subject to review on an abuse-of-discretion standard."). Thus, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence absent a clear showing of an abuse of discretion with attendant material prejudice to defendant. State v. Green , 184 Ohio App.3d 406, 2009-Ohio-5199, 921 N.E.2d 276, ¶ 14 (4th Dist.).
{¶ 25} When, however, an appellant alleges that a trial court's evidentiary ruling was " 'based on an erroneous standard or a misconstruction of the law,' " an appellate court reviews the trial court's evidentiary ruling using a de novo standard of review. Wray v. Wessell , 4th Dist. Scioto Nos. 15CA3724 and 15CA3725, 2016-Ohio-8584, 2016 WL 7912885, ¶ 13, citing Morris at ¶ 16, quoting Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership, 78 Ohio App.3d 340, 346, 604 N.E.2d 808 (2d Dist.1992) ; accord Estate of Johnson at ¶ 22 (reviewing admissibility of evidence by first examining whether, as a matter of law, statute applied, and then once threshold question concerning applicability of statute resolved, reviewing whether trial court abused its discretion); Med. Mut. of Ohio v. Schlotterer , 122 Ohio St.3d 181, 2009-Ohio-2496, 909 N.E.2d 1237, ¶ 13 (stating that "[w]hen a court's judgment is based on an erroneous interpretation of the law, an abuse-of-discretion standard is not appropriate"); Painter and Pollis, Ohio Appellate Practice , Appendix G (2015) (stating that although trial court decisions involving the admission of evidence are generally reviewed as a discretionary matter, but they are subject to de novo review if a clear legal rule applies. "For example, a trial court does not have discretion to admit hearsay into evidence").
2. Legal Analysis
{¶ 26} Wright's motion to exclude the remaining pills from evidence was based on Wheasler's testimony that he could not determine the substance of the pills with a reasonable degree of certainty because he failed to test a sufficient sample size. The trial court's rationale for denying the motion was that Wheasler had already testified and submitted his report; therefore, the remaining pills would not be excluded and it was a question for the jury to decide.
{¶ 27} The trial court's terse rationale could imply that Wright's motion was untimely. If so, it misapplies the standard for the timing of such objections. Evidentiary rulings become "ripe for consideration during the course of the trial" "when the issue is actually reached and the context is developed." State v. Grubb , 28 Ohio St.3d 199, 202-203, 503 N.E.2d 142 (1986). Because the trial court's evidentiary ruling was based on an erroneous standard or a *504 misconstruction of the law we apply a de novo standard of review.
{¶ 28} Wright argued that he could not have made the motion any sooner because the issue did not arise until Wheasler testified. We find Wright's motion timely under Evid.R. 103. Wright sought the exclusion of the remaining pills as evidence; he did not seek to strike Wheasler's report or testimony. To the contrary, Wright relied upon Wheasler's testimony to support his motion to exclude the pills as evidence. The state's forensic scientist could not identify the substance of the remaining pills with a reasonable degree of scientific certainty and they should have been excluded because they lacked the necessary foundation.
{¶ 29} We find no legal basis for the trial court's statement that it could not consider the testimony about statistical sampling and whether the expert's opinion was based upon a reasonable degree of scientific certainty. The trial court's decision not to exclude the remaining pills from evidence was contrary to law, which requires a proper scientific foundation. See Evid.R. 702 ; Valentine v. Conrad , 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 17-18 ("because even a qualified expert is capable of rendering scientifically unreliable testimony, it is imperative for a trial court, as gatekeeper, to examine the principles and methodology that underlie an expert's opinion"). Thus, the remaining pills should have been excluded.
{¶ 30} The state focuses on Wheasler's credentials and his testimony that he followed standard lab protocol to argue that "there was absolutely no basis for the trial court to exclude the testimony or laboratory report of Wheasler." The state argues that it was up to the jury to determine whether the untested pills contained oxycodone and the jury was free to accept or reject Wheasler's testimony. The state contends that Wright is asking us to reject the established protocol of the BCI, which would result in the overturning of countless convictions.
{¶ 31} However, our conclusion that the remaining pills should have been excluded is consistent with decisions in this and other appellate districts. "Hypergeometric" or "random sampling method" is an accepted method of testing. State v. Carroll , 2016-Ohio-374, 47 N.E.3d 198, ¶ 32 (4th Dist.). Evidence tested using this method "is sufficient as a matter of law to support a determination that the entire substance recovered together and similarly packaged is the same controlled substance as that tested." Id. citing State v. Gartrell , 2014-Ohio-5203, 24 N.E.3d 680, ¶ 96 (3d Dist.) (Belfance, J. concurring), and cases cited therein; see also State v. Edwards , 10th Dist. Franklin No. 12AP-992, 2013-Ohio-4342, 2013 WL 5450907, ¶ 40 ; State v. Dixon , 9th Dist. Medina Nos. 11CA0065, 2012-Ohio-4428, 2012 WL 4472094, ¶ 22-23. We are not rejecting the hypergeometric or random sampling method, nor are we requiring that every pill be tested, we are simply holding that where the expert witness testifies that he did not use the hypergeometric or random sampling method and therefore he cannot identify the content of the remaining pill population within a reasonable degree of scientific certainty, the remaining pills should be excluded.
{¶ 32} In Carroll , we found that although the Supreme Court of Ohio has not directly addressed this issue, other courts have concluded that " 'random testing is permissible when the seized samples are sufficiently homogenous so that one may infer beyond a reasonable doubt that the untested samples contain the same substance as those that are conclusively tested.' " (Citation omitted.) Carroll at ¶ 32, citing *505 State v. Garnett , 9th Dist. Medina No. 12CA0088-M, 2013-Ohio-4971, 2013 WL 6021467, ¶ 13 (Belfance, J. concurring), quoting People v. Jones , 174 Ill.2d 427, 429, 221 Ill.Dec. 192, 675 N.E.2d 99 (1996) and citing Annotation, Sufficiency of Random Sampling of Drug or Contraband to Establish Jurisdictional Amount Required for Conviction , 45 A.L.R.5th 1, Section 2[a] (1997) ("As a general rule, courts agree that random sampling of a homogenous substance is sufficient to establish the jurisdictional amount required by conviction * * *. The courts which embrace this view, however, commonly qualify it as a rule of reason and practicality which is not without limitations.").
{¶ 33} In Garnett , the concurring opinion noted that the federal courts have accepted the reliability of the hypergeometric or random sampling method:
In discussing the reliability of using random sampling, the Sixth Circuit has noted that
"[C]ourts have endorsed statistically based drug-quantity extrapolations predicated on random test samples in circumstances where the government was able to demonstrate an 'adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with the accepted standards of [reasonable] reliability.' "
United States v. Jackson , 470 F.3d 299, 310-311 (6th Cir.2006), quoting United States v. Scalia , 993 F.2d 984, 989 (1st Cir.1993), quoting United States v. McCutchen, 992 F.2d 22, 25-26 (3d Cir.1993).
Sufficient indicia of reliability may be found where the evidence demonstrates that
"(1) a proper 'random' selection procedure was employed; (2) the chemical testing method conformed with an accepted methodology; (3) the tested and untested samples were sufficiently similar in physical appearance; and (4) the tested and untested samples were contemporaneously seized at the search scene."
Jackson at 311, quoting Scalia at 989. Thus, critical issues with respect to random sampling pertain to the appropriateness of the random selection procedure and the methodology employed in testing for the particular substance.
Id. at ¶ 14 (Belfance, J. concurring).
{¶ 34} Here, Wheasler testified that he tested a total of only six of the pills. Of the 63 pills marked "M30" he tested only one pill. He admitted that to be able to determine the substance of the remaining 62 pills with a reasonable decree of scientific certainty he would "probably be testing somewhere around twenty of them."
{¶ 35} State v. Dixon, supra , has a similar factual scenario involving 106 pills of different colors and markings that allegedly contained N-Benzylpiperazine ("BZP"). Like Wheasler, the forensic scientist divided the pills up into groups of the same color and markings. However, unlike Wheasler, the forensic scientist in Dixon used the established and approved random sampling method to test larger sample sizes in each of her groupings. Notably the forensic scientist also had a grouping of 63 pills from which she tested 19 pills, the "somewhere around twenty" that Wheasler testified would need to be tested from his grouping of 63 pills to reach a reasonable degree of scientific certainty of the substance of the group. Dixon , 2012-Ohio-4428, 2012 WL 4472094, at ¶ 22.
{¶ 36} Coincidentally Stanton Wheasler was also the state's expert witness in Carroll, supra, and testified about the hypergeometric or random sampling method. There he indicated that his testing conformed with the appropriate sample sizes (he tested 21 of the 56 bags), and he was able to conclude within a reasonable degree *506 of scientific certainty that the remaining untested sample was cocaine:
Therefore, Wheasler's uncontroverted testimony as a stipulated expert witness that he could conclude within a reasonable degree of scientific certainty that the 56 plastic baggies in the pill bottle contained cocaine was sufficient to support the jury verdict. That is, his conclusion based on hypergeometric sampling that he had a 95% confidence level that at least 90% of the units in the 56-unit sample were cocaine was sufficient to establish that the 21.31 grams of off-white substance in the baggies was cocaine.
Carroll , 2016-Ohio-374, 47 N.E.3d 198, at ¶ 34.
{¶ 37} Here Wheasler's uncontroverted testimony was that he did not use a hypergeometric or random sampling method to test the pills and therefore he was not able to determine the substance of the remaining pills within a reasonable degree of scientific certainty. See State v. Boyd , 7th Dist. Belmont No. 15BE0032, 2016-Ohio-8560, 2016 WL 7912887, ¶ 37-38 (state's expert witness who testifies concerning the hypergeometric or random sampling method must give opinion "within a reasonable degree of scientific certainty"); State v. Gartrell , 2014-Ohio-5203, 24 N.E.3d 680, ¶ 94-96 (3d Dist.) (state's expert who testifies using the hypergeometric method and gives an opinion within a reasonable degree of scientific certainty does not need to test each individual unit of the drug). The trial court's evidentiary ruling was erroneous as a matter of law. The trial court should have exercised its gate-keeping function under Evid.R. 702 and excluded from evidence all but the six pills Wheasler identified as oxycodone.
{¶ 38} We sustain Wright's fifth assignment of error.
{¶ 39} Wright did not challenge the sufficiency of the evidence or the trial court's ruling on his motion for an acquittal. Therefore he waived any argument that the sum of the evidence offered by the state-whether erroneously admitted or not-was insufficient to sustain a guilty verdict. As a result, the Double Jeopardy Clause of the United States and Ohio Constitutions does not forbid his retrial. See State v. Brewer , 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 20 (a "trial error" such as the erroneous admission of evidence "does not implicate the type of governmental oppression that the Double Jeopardy Clause is intended to prevent"); Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (the Double Jeopardy Clause does not preclude the retrial of a defendant who succeeds in getting his conviction set aside for such 'trial errors' as the incorrect receipt or rejection of evidence); see also State v. Kareski, 137 Ohio St.3d 92, 2013-Ohio-4008, 998 N.E.2d 410 (discussing Brewer , Lockhart and State v. Lovejoy, 79 Ohio St.3d 440, 683 N.E.2d 1112 (1997) ). We reverse Wright's conviction and remand this matter to the trial court for a new trial.
{¶ 40} Wright's remaining assignments of error are moot by virtue of our ruling on Wright's fifth assignment or error; and therefore we do not address them. See App.R. 12(A)(1)(c).
IV. CONCLUSION
{¶ 41} Because the state's expert witness could not identify the substance of the remaining pills with a reasonable degree of scientific certainty, the trial court should have excluded them from evidence. The trial court erred in denying Wright's motion to exclude the evidence of the remaining pills. We reverse Wright's conviction *507 and remand this matter for further proceedings consistent with this opinion.
JUDGMENT REVERSED AND CAUSE REMANDED.
Abele, J. & Hoover, J.: Concur in Judgment and Opinion.

The charge in Count 1 required the state to prove the drug involved, oxycodone, "equals or exceeds five times the bulk amount but is less than fifty times the bulk amount." Counts 2 and 3 required a showing that drug "equals or exceeds the bulk amount but is less than five times the bulk amount."

Wright does not raise as an assignment of error the trial court's denial of his Crim.R. 29 motion for acquittal, nor does he make challenges based on "insufficiency of the evidence."

According to Wheasler's report, he tested 3 pills with a referenced strength of 30 mg and 3 pills with a referenced strength of 15 mg for a total quantity of 135 mg of oxycodone.