[Cite as *State v. Howard*, 2019-Ohio-5419.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                              :          Case No. 18CA3666

     Plaintiff-Appellee,                    :

v.                                         :          <u>DECISION AND</u>
                                                       <u>JUDGMENT ENTRY</u>
TYARRIA D. HOWARD,                         :
                                                      **RELEASED 12/30/19**
     Defendant-Appellant.                   :

<u>APPEARANCES</u>:

Katherine R. Ross-Kinzie, Assistant State Public Defender, Columbus, Ohio for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio for appellee.

Hess, J.

{¶1} After a jury found Tyarria D. Howard guilty of felonious assault, the court sentenced her to a four-year prison term and ordered restitution to the victim. Howard contends that she was denied the right to effective assistance of counsel because her attorney did not properly present impeachment evidence showing bias of one of the witnesses, failed to submit proper jury instructions on self-defense, acted unprofessionally throughout the trial, and gave a confusing closing argument. Howard also contends that her right to a fair trial and due process were violated by cumulative errors that occurred during the trial and that the trial court erred when it barred extrinsic evidence of bias.

{¶2} However, Howard has failed to establish that her attorney's performance was deficient or that she was prejudiced by it. Howard's attorney argued that the extrinsic evidence of bias was admissible under Evid.R. 616(A). Howard failed to show that her attorney's failure to submit written jury instructions prior to trial was both deficient

performance and prejudicial. Her counsel's unprofessional conduct consisted of three or four instances of interrupting the judge outside the presence of the jury, and Howard did not establish that this resulted in a "hostile feeling" that prejudiced her right to a fair trial. Howard failed to show that her attorney was deficient in her closing argument or that she suffered any prejudice. Because she failed to establish constitutionally ineffective assistance of counsel, her cumulative error contention also fails.

{¶3}   However, we find that the trial court erred when it ruled that the impeachment evidence to show a state's witness's bias was inadmissible. Extrinsic evidence of bias, interest or any motive to misrepresent is admissible and does not require that the proponent lay a foundation. Nevertheless, the trial court's error in excluding this evidence was harmless beyond a reasonable doubt because some of the evidence of the witness's bias was before the jury through other testimony and, notwithstanding that witness's testimony, the remaining evidence established Howard's guilt beyond a reasonable doubt.

{¶4}   We overrule Howard's assignments of error and affirm the trial court judgment.

## I. FACTS

{¶5}   A Ross County Grand Jury indicted Howard on one count of felonious assault in violation of R.C. 2903.11, a second-degree felony.  Howard pleaded not guilty. The matter proceeded to a jury trial, which produced the following evidence.

{¶6}   Aaron Ray, who was five feet, five inches tall and 160 lbs, testified that on the evening of May 11 and early morning hours of May 12, 2017, he was out celebrating a cousin's upcoming wedding with a bachelor party.  He left work at approximately 8 p.m.

and joined his friends and relatives at a local pub at approximately 9 p.m. Ray testified that when he arrived, everyone was ready to leave to go to another pub so he did not have anything to eat or drink at the first pub. At the second pub, Ray testified that he had one shot and a beer, the group ate three large pizzas, and stayed there for approximately an hour and a half. Following that, they went to Crosskeys Tavern to throw darts. Ray had another shot, a beer, and a non-alcoholic energy drink.

{¶7} Ray testified that at approximately 1:30 a.m. the group decided to leave but there was a commotion at the front of the bar blocking the exit. They were unable to leave out the back door because it was locked. One of the members of the party climbed over chairs and exited out the front door. Ray testified that he was unsure where some of the other people in the party were, but he was able to squeeze through the commotion and get out the front door. Ray did not engage in a verbal or physical argument with anyone as he exited the bar.

{¶8} Outside, the commotion grew louder. Ray observed a female bouncer and the bartender, Nathan Triplett, trying to restrain and control a large man, later identified as Butch Howard, who was six foot, four inches tall. Ray saw that the man was very hostile and aggressive. Ray continued to stand there watching, waiting for others in his party to exit the bar. The bartender told Ray to get out of there, so Ray turned right and went into the nearby parking lot walking with his hands raised in the air. As he was walking approximately eight to ten steps through the parking lot, he heard a woman say, "Take a look at this" and then he felt a glass smash into his face. The next thing Ray remembered was an emergency medical squad and "a pile of blood" on his clothes.

{¶9}    Ray testified that he did not get into any sort of verbal or physical altercation with anyone while he was at Crosskeys Tavern or in the nearby parking lot. He was just standing at the corner waiting for others in his party to exit the bar and watching the bartender and female bouncer control Butch Howard. Ray testified that he was not blocking a truck, he was not moved by anyone or restrained in any way, and though he knows Chris Frazier – Ray's brother bought some drinks for Frazier that night, Frazier did not come up to talk to him to get him to move away from any truck. When he was asked at the scene what had happened, he admitted he told officers that he did not know what happened or why it happened, "* * * 'Cause I haven't said anything to anyone or anything and this commotion was happening before we ever were or got up to it. We were no part of what was going on up by that door."  He denied making any statement to Butch Howard, nor did he threaten to "beat the ass" of Butch Howard.

{¶10}  Ray was transported to a local hospital, then transported by helicopter to Grant Medical Center in Columbus. Ray suffered a concussion, a ruptured globe of his right eye, skin lacerations, and the temporary loss of all vision in his right eye. Ray wears a patch over his right eye because he permanently lost his iris and his eye cannot regulate light. Ray underwent retinal reattachment surgery and was required to stay immobile on his left side for twelve days. As a result of the concussion, Ray had to undergo speech therapy. Ray has a permanent scar on his eye and on his face.

{¶11}  Ray testified that after he was released from the hospital, he went to the Chillicothe Police Station to give a DNA sample.

{¶12}  Nathan Ray, Aaron Ray's brother, is approximately five feet, seven inches tall, and testified that he was part of the bachelor party celebration that evening, which

included his brother Aaron, himself, and three others. Nathan testified that he had consumed alcohol throughout the evening but was not intoxicated. At approximately 1:30 a.m., he and the others in his group decided it was time to leave Crosskeys Tavern because a loud argument was going on at the front of the bar. As he approached the front to leave, he saw bartender Triplett talking with a large man. Nathan testified that he knew Triplett because the two had gone to elementary and high school together and had been on the high school wrestling team together.

{¶13} Nathan Ray had no easy way to exit the bar because the large man and bartender Triplett were right in the middle of the exit. Nathan asked Triplett if he was okay and at that point the large man began yelling at Nathan Ray. Nathan testified that he did not respond to the yelling, "As soon as he started yelling at me Nate Triplett [the bartender] pushed him back and then the guy was still yelling at me and I went to the front door because there was an opening" and exited the bar. Nathan testified that he and two others exited the bar, and his brother Aaron and another man were still inside but eventually came out as well. Nathan testified that he had not said or done anything to instigate a fight or threaten anyone.

{¶14} When Nathan Ray exited the bar, he turned toward the nearby parking lot and waited, about thirty feet from the commotion, for his brother Aaron. Nathan saw Aaron walking towards the parking lot with his arms in the air. Nathan and the other two men with him started to leave the area and exit through an alley behind Crosskeys Tavern, but then noticed that Aaron was not catching up with them. Nathan continued through the alley and approached Crosskeys from the other side to try to locate Aaron and saw an emergency medical services vehicle and Aaron covered in blood. Aaron was complaining

about how he could not see. Police officers at the scene questioned Nathan Ray. Nathan testified that he made no verbal or physical threats to anyone, nor did he physically block anyone's truck.

**{¶15}** Nathan Ray testified that he also saw a woman running when he saw his brother walking with his hands up, but that he did not tell the police about the woman, "I saw a woman running, but I didn't piece anything together because the large man was the aggressor."

**{¶16}** Nathan Triplett, the bartender of Crosskeys Tavern the night of the incident, testified that Butch Howard and his wife Tyarria were sitting at the bar in Crosskeys Tavern that night drinking alcohol with a group of friends. Butch Howard was drinking double Jack and Cokes and Tyarria Howard was drinking vodka and cranberry. Aaron Ray and a group were celebrating a bachelor party in the back area. At some point during the evening, Butch and Tyarria Howard had a disagreement. Triplett heard a loud "slap" noise and, based on comments from other patrons, came to understand that a physical altercation had broken out between Butch and Tyarria Howard so he told Butch Howard to leave. Triplett testified that Butch Howard is six foot four inches tall. Butch did not want to leave but Triplett came out from behind that bar and had a long, heated conversation with him and he eventually left. Tyarria started to go with him but then came back into the bar.

**{¶17}** Butch Howard returned about ten or fifteen minutes later, the female doorkeeper tried to keep him out and Triplett told him he was not allowed in the bar the rest of the night. Triplett testified that he came around and walked toward Butch to corral him at the door. A pretty sizable crowd began to form around them because, as Triplett

testified, "Anytime something like that happens people kind of flock to it." Triplett did not see Aaron or Nathan Ray or their group going towards the exit at that point because his full attention was on controlling Butch Howard. After Triplett managed to get Butch Howard outside, he saw Aaron and Nathan Ray leave. Triplett testified that he decided to shut the bar down for the night.

**{¶18}** Triplett's verbal exchange with Butch Howard was unpleasant because Butch was angry and had had too much to drink. He told Butch to go home. Triplett testified that Tyarria Howard hurried out the door. Triplett did not see Aaron Ray fighting with anyone or gesturing in a threatening manner towards anyone. Aaron Ray was standing in the parking lot, looking toward the street. A truck was parked off to the side of where Aaron Ray was standing. Triplett did not see anyone approach Butch Howard in a threatening manner and Butch eventually got into his truck. Triplett saw Butch and Tyarria Howard talking as they approached their truck and the two had been arguing with each other the entire evening. Triplett saw Tyarria Howard strike Aaron Ray in the face with a pilsner glass. Triplett did not see Aaron do anything to provoke the attack. After Tyarria struck Aaron, Triplett saw her back away, get into Butch's truck, and the Howards drive away.

**{¶19}** Triplett said that law enforcement had already been called before Aaron Ray was injured so they arrived very quickly thereafter.

**{¶20}** During cross-examination, Triplett was asked "about a month before this incident, you called Butch [Howard] a nigger and got sent home for the night didn't you?" and Triplett responded, "No." Triplett also testified that he did not know Stefan Morris and he did not use Morris's phone to call Butch Howard after the incident to apologize. When

asked whether Triplett heard Nathan or Aaron Ray threaten or taunt Butch Howard, Triplett testified that he was less than an arm's length away from Butch Howard during the confrontation and if someone had screamed at Butch that they were going to "kick his ass" Triplett would have been able to hear it as he was standing right next to Butch. Triplett heard no such threat to Butch Howard.

{¶21} Sergeant Michael Short testified that he was called to Crosskeys Tavern at approximately 1:30 a.m. to respond to a bar fight. When Sergeant Short arrived he saw Aaron Ray standing outside the bar, bleeding from the eye area. There were about seven to eight individuals standing around outside, but when Sergeant Short asked, no one said they had seen anything. Sergeant Short went inside the bar to determine whether there were any witnesses inside. Only the bartender, Nathan Triplett, gave a statement. Sergeant Short testified that he was one of the first officers to arrive at the scene, and eventually four or five other officers arrived.

{¶22} Officer Reginald Netter testified that he had been notified of an altercation at Crosskeys Tavern and was instructed to be on the lookout for Butch Howard's truck. At approximately 2:30 a.m., Officer Netter located and stopped Butch Howard's truck. As he approached the truck, he saw that Butch Howard was alone in the truck. Officer Netter testified that the truck smelled of marijuana and he saw a baggie of marijuana on the truck's middle console. Officer Netter performed a field sobriety test and determined that Butch Howard was not impaired. He detained Butch Howard until Officer Elword arrived to interview him.

{¶23} Officer Morgan Music of the Chillicothe Police Department testified that he was on duty during the early morning hours of May 12, 2017 when he was called to

respond to a bar fight at the Crosskeys Tavern in downtown Chillicothe. Several other police officers were at the scene when Officer Music arrived sometime between one and two o'clock in the morning. Officer Music testified that he walked around the scene, which included a parking lot directly west of Crosskeys Tavern, and saw blood and broken glass approximately ten or fifteen feet into the parking lot.

{¶24} Chillicothe Police Officer Thomas James Elword[1] testified that he responded to a call from Crosskeys Tavern at approximately 1:30 a.m. and spoke to bartender Triplett. Officer Elword then saw Aaron Ray walking toward him from the parking lot area, actively bleeding from the entire right side of his face. Officer Elword saw a piece of glass fragment sticking out of the globe of the far right side of his eye. After taking statements from Aaron and Nathan Ray and Triplett, Officer Elword radioed out a description of the silver truck that Butch and Tyarria Howard were believed to be driving. Officer Elword investigated the scene and was informed by Officer Music that glass fragments had been found in the parking lot near the Crosskeys Tavern. Officer Elword went to the area and observed the glass fragments in that area, which was about ten to fifteen feet off the sidewalk and behind the bank. Officer Elword took photographs of the broken glass in the parking lot, which were admitted into evidence. Officer Elword testified that he walked around the area and did not see any glass shards anywhere else.

{¶25} After law enforcement located Butch Howard and his truck, Officer Elword interviewed Butch Howard and learned that Tyarria Howard had been dropped off at home. Officer Elword went to Tyarria Howard's house, informed her of her Miranda rights, and asked her about any incidents or altercations that had taken place at Crosskeys

---

[1] Officer Elword is also referred to in the record as Officer James.

Tavern that evening. Tyarria stated that she had a verbal argument with her husband and that she had driven home. Officer Elword placed Tyarria Howard under arrest for felonious assault and took her to the Ross County Jail, where her shirt, pants and bra were removed and taken into evidence.

{¶26} Both Butch and Tyarria Howard appeared intoxicated to Officer Elword as both smelled of alcohol and had slightly slurred speech. Officer Elword also believed Aaron Ray was intoxicated as he smelled of alcohol, had slurred speech and was "sort of incoherent." However, he acknowledged that persons who have suffered blunt force trauma to the head also suffer from slurred speech.

{¶27} Officer Elword testified that it is approximately fifty feet from the door of Crosskeys Tavern to the corner where the parking lot begins and the glass shards were found an additional ten to fifteen feet into the parking lot. The following evening, Officer Elword collected the glass shards he found in the parking lot. The glass shards were submitted to the Bureau of Criminal Investigation; the blood on them tested positive as Aaron Ray's.

{¶28} Approximately five months later, Officer Elword learned that three additional individuals claimed to have information regarding the incident: Shannon McMannis, Stefon Morris, and Chris Frazier. Officer Elword telephoned and sent written letters to them but none of them returned his phone calls or letters.

{¶29} In Tyarria Howard's defense, Chris Frazier, who is six feet, three inches tall and 235 lbs, testified that he was at Crosskeys Tavern on the evening of the incident and that he knew both Butch and Tyarria Howard and Aaron and Nathan Ray. When Frazier arrived at the bar, he sat at a table behind the Rays. Frazier saw Butch and Tyarria get

into an argument, which was so loud the entire bar was aware that they were fighting. Butch left the bar, but then came back fifteen to twenty minutes later. Frazier was outside the bar smoking a cigarette when Butch Howard returned. He saw Butch go inside and heard bartender Triplett tell Butch Howard to leave because he was kicked out of the bar for the night. Frazier testified that Nathan Ray appeared at the door but he could not hear what Nathan Ray was saying; Triplett's voice was much louder, he was yelling, and it carried through the door to the outside.

**{¶30}** Frazier testified that Butch Howard's truck was parked on the street in front of the bar, about two or three places from the bar's front door. According to Frazier, Butch's truck was parked in the last possible spot before reaching the side parking lot. As the argument spilled outside the bar, Frazier just stood back smoking his cigarette. Frazier saw people attempting to get Butch Howard into his truck and he noticed Aaron Ray standing in front of the truck. Frazier said he tried to talk to Aaron Ray but it did not seem to have an effect; Aaron continued to stand in front of the truck. Frazier saw Aaron Ray "jumping up and down" and he believed Aaron Ray was "trying to steal a fight" with Butch Howard. Frazier walked away but Stefan Morris grabbed Aaron Ray and pushed him out of the way of the truck. Aaron was struggling to get away from Morris and took a swing at Morris, but Morris continued to restrain Aaron. Frazier testified that Butch Howard was in the truck while Morris was attempting to move Aaron away from the front of the truck.

**{¶31}** Frazier testified that he has known Aaron Ray for about ten or eleven years and he is "usually calm, cool, collected. I mean people get drunk, but he's never aggressive." Frazier saw Tyarria going towards the truck but he could not see her hit

Aaron because there were people standing in front of him and "there was so much going on I couldn't see actually what happened." Frazier testified that he saw Aaron trying to struggle free from Morris's hold, almost get free, and lunge in Tyarria's direction while still being held by Morris. Because of the crowd, Frazier testified that he lost sight of Tyarria as she approached the truck and did not see her strike Aaron or get into the truck.

{¶32} Frazier said that as he stood outside the bar, Nathan Ray came from around the side from the alley and asked, "Hey, what exactly happened?" and Frazier testified, "I told him I don't know what exactly happened. I'm not sure" and "I believe everybody is that way." Nathan Ray then said, "Okay thank you" and walked in the direction Frazier indicated. According to Frazier, the bartender Triplett never came out from behind the bar to go outside. Frazier also did not see Aaron Ray with his hands up in the air or looking confused, and he did not hear anyone threaten Aaron Ray other than to ask him to stop standing in front of the truck. Frazier had "maybe a couple of shots" to drink that evening.

{¶33} A few days after the incident, Frazier asked his girlfriend to prepare a written statement of the event on a notepad, which he gave to the Howards. Frazier said that he had his girlfriend write it because she has better handwriting. Frazier conceded that the date in his written statement indicated the incident occurred on May 15, but that this was just an honest mistake on his part. In the statement Frazier's girlfriend wrote:

> On May 15, 2017 I was outside smoking a cigarette at the Crosskeys I noticed Butch was yelling & arguing with a group of guys. Butch was being escorted to his truck I then noticed an intoxicated guy standing in front of Butch's truck preventing Butch from leaving. Butch got out of his truck & the guy in front of his truck started going towards Butch a couple people grab Butch to put him back in his truck. I told the guy to get out of the street he's trying to leave I seen him tussling with Stefan [Morris] trying to get the guy from in front of Butch's truck. The guy was then hit.

**{¶34}** Frazier testified that he had known Aaron Ray since high school and would hang out with him from time to time when people gather around Thanksgiving and Christmas. Even though Frazier knew Aaron Ray, Frazier could not answer why he did not refer to him by name, as he had the other persons in his written statement, but instead continually referred to him as "a guy" or "the guy." Frazier did not speak to any of the police officers that had responded to the incident at Crosskeys that evening.

**{¶35}** Shannon McMannis testified that she was at Crosskeys Tavern that evening with three friends celebrating her birthday. McMannis knows Tyarria Howard because their daughters are friends. McMannis heard Aaron Ray threaten Butch Howard with words like, "Come outside I'm going to beat your ass." McMannis testified that she never witnessed any argument between Butch and Tyarria Howard that night. McMannis testified that Butch and Tyarria went outside and several of Butch's friends were trying to get Butch into his truck so Butch would not begin fighting with anyone. The majority of bar patrons followed them outside. McMannis said that the "group of boys were surrounding his truck still yelling and acting belligerent." McMannis testified that the scene was chaotic, with yelling, running and screaming, but during all of this she saw Aaron Ray come from the front of the truck and toward the passenger side of it. According to McMannis, "After I saw him come around from the front of the truck I seen Tyarria hit him." McMannis testified that the guys around the truck with Aaron Ray were pretty belligerent, drunk, and screaming. McMannis saw one of Butch's friends, Stefan Morris, grab Tyarria after she struck Aaron Ray with the glass. McMannis testified that she could not see what was happening on the other side of the truck.

{¶36} McMannis testified that she had had several shots of alcohol to drink that night but did not believe she was impaired because she was still able to walk, which is how she determines if she is impaired. According to McMannis, Butch Howard, Chris Frazier and Stefan Morris were all three on the driver's side of the truck, getting Butch into the truck "so he wouldn't fight with the gentleman." McMannis could not see the driver's side of the truck from her angle but she did see a "a group of boys surrounding his truck still yelling and acting belligerent." Through all the chaos, McMannis saw Aaron Ray run from the driver's side back into McMannis's view, "After I saw him come around from the front of the truck I seen Tyarria hit him." McMannis thought that Aaron Ray "was probably being pushed away and that's just what I'm thinking cause like I said, I could not see on that side." As Aaron Ray either ran or was pushed around the side of the truck, Tyarria Howard struck Aaron with the glass. Then McMannis saw Stefan Morris grab Tyarria Howard. In McMannis's mind, the group of men with Aaron Ray were the aggressors in the situation. However McMannis testified that she was unaware that Butch Howard had been kicked out of the bar for an altercation with Tyarria and McMannis also left the bar to smoke and was unaware of what transpired during her smoke breaks. McMannis testified that Butch Howard's truck was parked on the street directly in front of the bar and that Tyarria struck Aaron with the glass five or six feet from the front door of Crosskeys Tavern's front door. McMannis testified that she did not recall seeing Triplett, the bartender, while she was outside witnessing the events. McMannis testified that she did not speak to the law enforcement officers who arrived at the scene that evening.

{¶37} Stefan Morris, who is six feet, one inch tall and 175 lbs, testified that he is friends with Butch and Tyarria Howard. While at Crosskeys Tavern that night, Morris saw

Butch and Tyarria have an altercation at the bar.  It was a loud altercation, with bickering back and forth. Then he heard a hand slam down on the counter; it made "a loud echo" and then Butch walked out. Butch came back about ten minutes later, but the female doorkeeper told Butch he was not allowed inside. Morris heard bartender Triplett tell Butch to get out and that Butch could pay his bar tab later.  Morris heard some other guys make threats to Butch, such as "We'll kick your ass." According to Morris, Butch turned and voluntary walked out to his truck. Morris followed directly behind Butch and helped him get into his truck. Butch shut the door and started the truck, when Morris noticed that in front of the truck "a guy standing there talking to Chris [Frazier] and Chris is talking to him and next thing I know Chris throws his hands up and walks away and dude [Aaron Ray] is just still standing there in front of his truck like he's a barrier."  After Frazier walked away, Morris approached the guy and grabbed him and moved him out of the way of the truck so the Howards could leave. Aaron Ray had not tried to get physical with anyone until after Morris grabbed and pushed him.

> Q: Okay so you moved him over to the side and then what?
>
> [Morris]: Moved him over to the side and he wanted to start tussling with me and stuff like that and trying to break loose from me and I was just pushing him on the sidewalk to keep him on the sidewalk so they could leave without there being an altercation.
>
> Q: Did he swing on you at any time?
>
> [Morris]: He swung on me once or twice, but nothing I couldn't move out of the way of, the guy was kind of short. But, next thing I know he's acting all crazy and he breaks away from me and then-o
>
> Q: --And then what happened?
>
> [Morris]: He gets hit with a glass.
>
> Q: Okay, so, let's talk about how that happened. Where was Tyarria?

[Morris]: Coming from the bar.

Q: Could you see her walking up?

[Morris]: I seen somebody walking up, I didn't know it was her exactly, but I could see somebody from my peripheral walking upon the side of me, behind me.

Q: Okay –

[Morris]: -- And then he breaks loose and I turn around and I hear a crash. I turned around to see where he was going and I seen a crash. Seen the glass to the eye. (Tr. 105-106)

{¶38} Morris testified that Tyarria Howard struck Aaron Ray in the eye approximately two steps from the passenger door of the truck, which was open, but he did not actually see the glass connect with Aaron. Morris described the event several times. "No, I didn't get to see it. I heard it and turned around and seen the aftermath of the glass falling around." "When he broke away from me, I went to grab him again, but that's when he was already hit. I went to turn around to grab him and he was already hit. It was literally that fast." "Once he broke away from me, he took, he leaned forward towards the truck and that's when I'm going to turn around to grab him again and he's already hit. He's literally, it's literally that fast from me holding him on the side of the truck on the sidewalk and he's trying to stand away from me, grabbing my arms, flailing, swinging his arms around and he broke loose." Glass from the blow shattered onto Morris. Tyarria Howard was a few steps from the open passenger side door of the truck and Aaron Ray had broken free from Morris's hold and lunged toward the truck as he did so. Morris was concerned for Tyarria's safety but he was not scared for her because Morris was there to make sure nothing happened and was helping the Howards get into

their vehicle and leave. Morris got into a car with a friend and left the scene just as the police arrived and did not speak to any law enforcement officers that night.

**{¶39}** Morris also testified that he provided a written statement to Tyarria Howard but that the statement was written down by Tyarria as he spoke to her over the telephone. Morris signed the statement that Tyarria wrote out, which accurately reflected the statements he made to her in the telephone call. Morris conceded that the date of the event on the written statement wrongly states "On May 15, 2017" when the incident occurred on May 12, 2017. Morris also conceded that Butch and Tyarria were already at the bar when he arrived, contrary to his written statement which states he was there first, explaining "—Well, I had it backwards, when I came in."  His statement read:

> On May 15, 2017 I was at the Crosskeys and I spoke to Butch & Tyarria when they came in. I then went on about my business until he noticed everyone going outside the bar following Butch & two other guys that I didn't know. I was able to grab Butch & walk him to his truck & try to keep the other guys from getting to Butch. One guy went for Butch & one guy jumped in front of Butch's truck I grabbed the guy that lunged and was trying to get to Butch that was standing in front of Butch's car & tried to prevent Butch from leaving. I start tusseling [sic] with this guy he was swinging trying to breakaway on me & going for Butch. Then he was hit & glass was on me.

**{¶40}** Morris testified that he had knowledge of a telephone call between bartender Triplett and Butch Howard a few days after the incident when he happened to run into Triplett and a friend outside of a shoe store.

**{¶41}** Tyarria Howard testified that she and Butch were at a pub where she had a drink and then they went to Crosskeys Tavern. Tyarria and Butch got into a loud, yelling argument at Crosskeys because Butch had ordered a round of drinks for the entire bar. Butch "ends up walking out." Bartender Triplett asked Tyarria what's wrong with Butch and Tyarria tells Triplett that Butch was mad but "he'll be alright." Butch was gone about

ten or fifteen minutes and then returns to Crosskeys and Triplett approaches Butch and talks to him and "I don't think anything of it, I mean, It's just regular, he's back in here now."

**{¶42}** Tyarria testified that then Butch got really loud shouting, "you didn't kick me out, I left on my own, why am I barred." Tyarria had never seen Aaron or Nathan Ray before and did not know them. She believes it was Nathan Ray who approached Triplett and Butch and spoke to them. At first Tyarria did not pay any attention to Butch and Triplett but then Butch and Triplett started getting upset with each other and Butch said "really loud" that "I'm not barred, I left on my own, you didn't bar me." Aaron and Nathan Ray begin arguing with Butch, the commotion starts, and everyone goes outside. Tyarria took her alcoholic drink with her because she was in a rush and "there was still a little liquor inside of my cup." She goes outside and hears Butch telling her to "get in the effing car." Butch is inside the truck on the driver's side and Tyarria walks towards it. She is careful because "It's a whole crowd of people out there and everyone is being like extremely, extremely aggressive. I mean it was just like utter chaos." Tyarria is walking to the truck and sees Stefan Morris "tussling" with Aaron Ray. "* * * While I'm walking to the truck I see Stefan [Morris] over there tussling, fighting with the gentleman, Aaron Ray." Then Aaron Ray comes towards Tyarria and says to Butch "I'm going to kick your ass." Aaron Ray was about two feet from her so "to protect myself," she hit him with the glass. She was afraid "so I did use a lot of force, I'm sure."

**{¶43}** Tyarria, who is five feet four and of average build, did not see Aaron Ray walking with his hands in the air to show he was not a problem. Tyarria testified that when

the police interviewed her shortly after she left Crosskeys, she did not tell them about the incident at the bar because she was always told to talk to a lawyer before saying anything.

**{¶44}** On cross-examination, Tyarria stated that it took her about a minute to travel fifteen feet from the bar to the truck because the area was really crowded and being only five feet, four inches, she was not able to see what was happening around the truck. Tyarria was close to the door of the truck when she was able to see Stefan Morris and Aaron Ray and a little less than an arm's reach of the door. "Butch popped it open and said, tell T [Tyarria] to get the eff in the car." Tyarria struck Aaron Ray with the glass because she thought he was trying to get into the truck to fight Butch. After she struck Aaron Ray, Stefan Morris pushed her into the truck and Butch drove away.

**{¶45}** Tyarria said she was at her house for a period of time before the police arrived. Tyarria testified that she does not recall telling the police anything and, although the police statement says that she told police she had an altercation with her husband, she testified that she did not tell the police anything. Tyarria reviewed Chris Frazier and Stefan Morris's written statements and testified that she wrote out Morris's statement, but Frazier's girlfriend wrote out his statement for him and then he gave it to Tyarria. Tyarria testified that she did not re-write Frazier's statement in her own handwriting. However, Tyarria conceded that both written statements had the same incorrect date of "May 15, 2017," both started with an almost identical "O" in "On" and both used a rather unique symbol for the word "and."

> Q. Are we to believe then that you and Mister Frazier's girlfriend, both make your "O's" identical to each other and use the same symbol in place of the word "and"?
>
> Howard: Yes.

{¶46} Despite the striking similarity in the handwriting of Frazier's and Morris's written statements and the identical notebooks on which they both were written, on redirect Tyarria insisted that it was not possible that Frazier was confused about who wrote out his statement for him and it was not possible that Frazier dictated the statement to Tyarria:

Q. Is it possible that Chris [Frazier] could have dictated it to you and thought that he dictated it to his girlfriend?

Howard: No.

Q. No, it's not possible that he could have dictated it to you thinking that it was his girlfriend that he dictated it to?

Howard: No.

Q. Over a year later?

Howard: No.

{¶47}   The state presented Officer Elword in rebuttal who testified that he gave Tyarria Howard a Miranda warning, but she did not assert her right to remain silent or her right to an attorney while at her house and instead answered his questions in the manner he testified to earlier. Tyarria did not request an attorney until after Officer Elword transported her to the jail and he began asking her questions about her identity, date of birth, social security number and things of that nature.

{¶48}   The jury returned a guilty verdict. The trial court sentenced Tyarria Howard to a four-year prison term and ordered restitution to the victim.

## II. ASSIGNMENTS OF ERROR

{¶49} Howard assigns the following errors for our review:

I.      TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF
        COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT TO THE

UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION. *STRICKLAND V. WASHINGTON,* 466 U.S. 668, 104 S.CT 2052, 80 L.ED.2D 674 (1984). (DAY ONE, T.P. 191, 218, DAY TWO, T.P. 73, 122-126, 204, 207-208, 212-215, 221, 227, 229-230, 232).

II.     TYARRIA HOWARD'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW WERE VIOLATED BY THE CUMULATIVE ERRORS THAT OCCURRED DURING HER TRIAL. FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION. (DAY ONE, T.P. 191, 201, 218, DAY TWO, T.P. 73, 122-126, 204, 207-208, 212-215, 221, 227, 229-230, 232).

III.    THE TRIAL COURT ERRED WHEN IT BARRED EXTRINSIC EVIDENCE TO PROVE BIAS OF THE BARTENDER. EVID.R. 616(A). (DAY TWO, T.P. 110-126).

### III. LAW AND ANALYSIS

#### A. Ineffective Assistance of Counsel

**{¶50}** Howard contends she received ineffective assistance of counsel because her attorney (1) failed to properly present impeachment evidence showing bartender Triplett's bias; (2) failed to submit proper jury instructions concerning self-defense; (3) acted unprofessional during the trial; and (4) gave a misleading and confusing closing argument.

**{¶51}** To establish constitutionally ineffective assistance of counsel, a criminal defendant must show (1) that his or her counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him or her of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient

performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "Failure to establish either element is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14.

{¶52} When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland* at 689, 104 S.Ct. 2052. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation omitted.) *Id.* "A properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor,* 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, citing *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 61.

{¶53} "Furthermore, courts may not simply assume the existence of prejudice, but must require that prejudice be affirmatively demonstrated." *State v. Walters,* 4th Dist. Washington Nos. 13CA33, 13CA36, 2014-Ohio-4966, ¶ 24, *Id; State v. Jones,* 2018-Ohio-239, 104 N.E.3d 34, ¶ 21-24 (4th Dist.). We have repeatedly recognized that speculation is insufficient to establish the prejudice component of an ineffective

assistance of counsel claim. *E.g., State v. Dailey,* 4th Dist. Adams No. 18CA1059, 2018-Ohio-4315, ¶ 33 and cases cited therein.

**{¶54}** Generally, "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Guysinger*, 4th Dist. Ross No. 15CA3514, 2017-Ohio-1167, ¶ 27, *appeal not allowed*, 151 Ohio St.3d 1454, 2017-Ohio-8842, 87 N.E.3d 222, ¶ 27, quoting *State v. Leonard*, 104 Ohio St.3d 54, 2004–Ohio–6235, 818 N.E.2d 229, ¶ 146. Moreover, " '[a]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.' " *Id.,* quoting *State v. Dorsey*, 10th Dist. Franklin No. 04AP–737, 2005–Ohio–2334, ¶ 22, quoting *In re Brooks*, 10th Dist. Franklin No. 04AP164, 2004–Ohio–3887, ¶ 40; *see also State v. Allah*, 4th Dist. Gallia No. 14CA12, 2015–Ohio–5060, ¶ 23.

1. Impeachment Evidence – Morris's Testimony of Triplett's Telephone Call

**{¶55}** Although extent and scope of cross-examination clearly falls within trial strategy and should not be scrutinized, Howard argues that here it was clear from the record that her attorney intended the scope of her cross-examination of Triplett to be adequate enough to permit Morris's impeachment testimony concerning the alleged phone call between Triplett and Butch Howard. Therefore she argues that her failure to do so was not trial strategy, but error. However, the record refutes this as Howard's attorney explained to the court at sidebar that it was her trial strategy not to continue with further cross-examination as she wanted to avoid what she anticipated would be a series of sustained objections against her:

The Court: He was asked about a phone call and he said no.

* * *

[Defense Counsel]: He said he didn't make the phone call. After he said he didn't make the phone call and I start, I keep going with "Well, during this phone call that you say you didn't make, didn't you say blah, blah, blah". I'm going to be objected to all over the place.

[Prosecutor]: But you didn't specifically ask him did you ever say this.

[Defense Counsel]: Well, but, no, I can't because the minute you object and he sustains, nothing can be considered for the record it's out of the record, so I can't ask questions that I know will be sustained by the judge.

**{¶56}** Because we find that the scope and extent of defense counsel's cross-examination of Triplett was trial strategy, we reject Howard's argument that her attorney was ineffective in failing to lay the proper foundation to allow the impeachment evidence in under Evid.R. 616(C).[2] "We will 'not second-guess trial strategy decisions.' " *State v. Cepec,* 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 52, quoting *State v. Mason,* 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998).

**{¶57}** Moreover, as we discuss next, because Howard's attorney argued that the impeachment evidence should have been admissible under Evid.R. 616(A) to show bias, any failure to lay a proper foundation under Evid.R. 616(C) was not prejudicial.

**{¶58}** Howard's second argument is that trial counsel could have fixed her error in failing to lay the proper foundation, if she had also argued that the evidence was admissible to show bias under Evid.R. 616(A). However, at a bench conference Howard's counsel did argue that the telephone call showed Triplett's bias against Butch Howard and the trial court confirmed this, "Alright, so you're offering it as A six sixteen [Evid.R.

---

[2] Howard's brief cites Evid.R. 616(C). The trial court referenced Evid.R. 616(C) and found that to be admissible under that subsection, the evidence must also be permitted by Evid.R. 613, Impeachment by Self-Contradiction, subsection (B)(1), which requires the witness have a prior opportunity to explain or deny. The trial court found that did not happen during defense counsel's cross-examination of Triplett, thus counsel failed to lay the proper foundation under Evid.R. 613.

616(A)] for bias?" Howard's attorney answered affirmatively. The trial court asked how an apology to Butch Howard would show that Triplett was biased against him, " * * * If he was biased in that fashion, why would he have apologized?" In response, Howard's attorney further explained that the telephone call also included Triplett's offer not to testify in exchange for a monetary payment from Butch.

**{¶59}** Because the record shows that Howard's attorney did, in fact, argue that the impeachment evidence concerning the substance of the alleged telephone call was admissible to show bias under Evid.R. 616(A), we reject Howard's argument that her attorney was constitutionally ineffective on this ground. Moreover, because Howard's attorney argued admissibility under Evid.R. 616(A), any failure to properly lay a foundation for it under Evid.R. 613(B)(1) for purposes of Evid.R. 616(C) was not prejudicial. Ohio does not require that a foundation be laid as a prerequisite for the introduction of extrinsic evidence of witness bias under Evid.R. 616(A). *See State v. Griffith,* 2015-Ohio-4112, 43 N.E.3d 821, ¶ 16 (2nd Dist.) citing *State v. Williams*, 61 Ohio App.3d 594, 597, 573 N.E.2d 704, 706 (9th Dist.1988) (discussing *State v. Kehn*, 50 Ohio St.2d 11, 19, 361 N.E.2d 1330, 1335 (1977) certiorari denied (1977), 434 U.S. 858, 98 S.Ct. 180, 54 L.Ed.2d 130 and Weissenberger, Ohio Evidence (1985) 32–33, Witnesses, Section 607.7).

2. Failure to Submit Jury Instructions Prior to Trial

**{¶60}** Next Howard argues that her attorney was constitutionally ineffective for failing to submit proposed jury instructions. More specifically she argues that her attorney should have submitted jury instructions on non-deadly force self-defense. However, although Howard's attorney did not submit a jury instruction on non-deadly force prior to trial, Howard concedes that her attorney argued for the non-deadly force self-defense jury

instruction at trial. Howard believes that had her attorney argued more effectively for a non-deadly force self-defense instruction, "the trial court would have given the non-deadly force instructions" and "the trial would have ended differently." The record shows that Howard's attorney argued for the non-deadly force instruction and provided case authority for the court's consideration. The state and Howard's attorney each gave arguments and cited legal authority for their positions and the trial court focused much of its time and attention considering the arguments concerning whether to use the "non-deadly force" or the "deadly force" self-defense jury instructions. When Howard's attorney failed to win her argument for a non-deadly force self-defense instruction, she made an objection on the record. Howard does not challenge the trial court's self-defense jury instruction as improper on appeal.

{¶61} Generally, a trial court has broad discretion to craft jury instructions. *Wray v. Wessell,* 4th Dist. Scioto No. 15CA3724, 2016-Ohio-8584, ¶ 63, citing *State v. White,* 142 Ohio St.3d 277, 2015–Ohio–492, 29 N.E.3d 939, ¶ 46. Here Howard does not contend that the trial court acted improperly in giving the deadly force self-defense instruction. Rather, Howard argues that her attorney was constitutionally ineffective because her attorney did not submit written jury instructions in advance of trial and then, during trial, did not make an effective argument for a different self-defense instruction. Because Howard does not contend that the trial court's jury instructions were erroneous, and because Howard's attorney argued for alternative instructions, provided legal authority for her argument, and preserved her objection to the jury instruction for the record, Howard has failed to establish either deficient performance or prejudice. *See State v. Dean*, 146 Ohio St. 3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 280-281 (although

defense counsel did not submit written jury instructions prior to trial as requested by the trial court, the defendant failed to establish deficient performance or prejudice where defense counsel had made comprehensive objections and proposed changes to the jury instructions and the defendant did not identify any improper instructions). Additionally, Howard cites to nothing in the record to support her speculative claim that the trial court would have given the non-deadly force jury instruction had her attorney submitted it in writing prior to trial. The state argues that there are numerous cases that support the trial court's decision to give the deadly force jury instruction and cites them in its brief.

### 3. Unprofessional Conduct During Trial

**{¶62}** Howard contends that her attorney's decorum in the courtroom caused the trial court to have a "hostile feeling" towards her, which prejudiced Howard. Howard cites to a bench conference in which her attorney agreed with the trial court by stating, "Okay" and then walked away from the bench. The trial court stated "Stop, stop counsel, come back. Don't walk away from us –" and her attorney states "I understand what you're saying." The trial court responded "Don't walk away and don't interrupt and don't roll your eyes at me. You're going to find yourself in contempt quickly. Don't roll your eyes at me, understand?" The record indicates that this exchange occurred entirely during a bench conference. There is nothing in the record to indicate that the jury heard it or that the trial court became biased or prejudiced against Howard because of it.

**{¶63}** The remaining three instances of interruptions during the two-day trial all occurred after the jury had exited the courtroom. In one of the exchanges Howard cites to, it is the trial court who appears to have interrupted Howard's attorney:

> [Defense Counsel]: I don't think that you have to allow someone to actually hit you or weigh you down before you're allowed to respond and she, there's no testimony whatsoever that she took a step towards him –
> The Court: -- that will be an argument for the jury, not to me—
> [Defense Counsel]: --testimony, well, then—
> The Court: --stop interrupting me. If you do it one more time! Quite simply, that's an argument for the jury. * * *

In the third interruption, Howard's attorney politely apologized, adding that she had thought the judge was finished speaking.

**{¶64}**  We have described judicial bias as:

> [A] hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.* * *  [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. * * * A trial judge is presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity.  Bias against a party is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party. (Citations and internal quotations omitted.)

*State v. Gerald,* 4th Dist. Scioto No. 12CA3519, 2014-Ohio-3629, ¶ 51.

**{¶65}**  Howard cites to nothing in the record to establish her contention that these interruptions created a hostile feeling towards her or affected the outcome of her case.  A review of the trial transcript does not indicate that the trial judge displayed any "deep-seated favoritism or antagonism that would make fair judgment impossible."  To the contrary, at Howard's sentencing hearing, the trial court complimented her attorney, "* * *stay in contact with your attorney. Miss Dennison is a good attorney, she can talk to you about your appellate options."

### 4. Closing Argument

**{¶66}** Howard contends that her attorney was constitutionally ineffective for giving a deficient, misleading, and confusing closing argument.

**{¶67}** The trial court admonished the jury that closing arguments are not evidence but "merely counsel's recitation of what they believe the evidence has shown and what the inference of that evidence means." The jury was instructed to disregard the attorneys' recollection of the evidence and trust their own recollection: "if your recollection of what the evidence and testimony was differs from that of the attorneys, it's your recollection that controls."

**{¶68}** Generally, "[c]ounsel's decision on whether to give an opening statement or closing argument and how to formulate and deliver them are tactical decisions." *See State v. Guysinger,* 4th Dist. Ross No. 15CA3514, 2017-Ohio-1167, ¶ 34; *State v. Fouts*, 4th Dist. Washington No. 15CA25, 2016–Ohio–1104, ¶69, citing *State v. Bradley*, 42 Ohio St.3d 136, 144, 538 N.E.2d 373 (1989) (rejecting defendant's ineffective assistance of counsel claim that his counsel's closing argument was "too brief, passionless and themeless"). Normally "[t]he substance of closing argument falls within the realm of trial strategy." *State v. Cameron,* 10th Dist. Franklin No. 09AP–56, 2009–Ohio–6479, ¶ 31.

**{¶69}** Howard contends that her attorney was ineffective for making the statement that "closing [argument] doesn't really make much of a difference." Howard argues that this statement undermined her attorney's credibility and ability to advocate on Howard's behalf. We find that the statement falls squarely within the realm of trial strategy. It reinforces the trial court's admonishment that closing arguments are not evidence but "merely counsel's recitations" and it was made shortly after the state presented its closing

argument. Thus, Howard's attorney may have strategically made the statement to undermine or weaken the impact of the state's closing argument, particularly if she thought the state had made a particularly strong closing argument.

**{¶70}** Next Howard complains that her attorney confused or misled the jury because she appeared to argue that Howard accidently hit Aaron Ray with the glass, when she should have argued that she intentionally hit Aaron Ray in self-defense.  We agree that there was some initial confusion. The trial court interrupted Howard's attorney's closing argument and called a bench conference to state that the trial court believed Howard's attorney was arguing that Howard accidentally hit Ray and the court would be removing the jury instruction on self-defense. The court instructed counsel to continue with the closing argument. At a second bench conference, Howard's attorney told the trial court that she was not arguing accidental contact, but rather that Howard's hit to Aaron Ray's eye was not planned and the degree of force used was more severe, in part, because Aaron Ray was coming towards her.

**{¶71}** The trial court allowed Howard's attorney to clarify that and continue with her closing argument. Howard's attorney explained to the jury that there was a misunderstanding about what she was trying to demonstrate to the jury. She explained that Howard meant to hit Aaron Ray in self-defense, but that the amount of force that went into the hit was multiplied by the fact that Aaron Ray was charging at her. Her self-defensive hit was something that happened in the spur of the moment. Howard's attorney then went on to address the jury on all the relevant elements to self-defense, including the lesser burden of proof, and to argue in favor of the credibility of the defense witnesses.

**{¶72}** After reviewing the closing argument in full, we do not believe counsel's performance during closing was deficient, misleading or confusing.  Howard's attorney explanation was sufficient to clear up any possible misunderstanding that the hit was accidental.

**{¶73}** Howard has failed to establish constitutionally ineffective assistance of counsel. Her attorney argued that the impeachment evidence was admissible to show bias under Evid.R. 616(A). Howard failed to show that her attorney was deficient for not providing written jury instructions prior to trial or that the trial court would have adopted her version of them if she had done so. The four verbal interruptions during the course of a two-day trial occurred outside the jury's presence or at bench conferences and did not result in the trial court developing a "hostile feeling" towards Howard or prejudice her case. Howard's attorney's closing argument was based, in part, on strategy and adequately addressed the misunderstanding the trial court had concerning whether the hit was accidental or an act of self-defense.

**{¶74}**  We overrule Howard's first assignment of error

### B. Cumulative Error

**{¶75}**  In her second assignment of error, Howard contends that her right to a fair trial and due process were violated by the cumulative errors identified in her first assignment of error.  She argues that the failure to get the evidence of the alleged telephone call between Triplett and Butch Howard, the failure to submit written jury instructions, the interruptions, and the closing argument, cumulated to deprive her of her constitutional right to a fair trial and due process.

**{¶76}** Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus; *State v. Ruble*, 2017-Ohio-7259, 96 N.E.3d 792, ¶ 75 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith*, 2016-Ohio-5062, 70 N.E.3d 150, ¶ 106 (4th Dist.), citing *State v. Harrington*, 4th Dist. Scioto No. 05CA3038, 2006-Ohio-4388, ¶ 57.

**{¶77}** The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.' " *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 148 ("And to the extent that Mammone more broadly invokes the doctrine of cumulative error, that doctrine does not apply because he cannot point to 'multiple instances of harmless error.' " ). *State v. Fannon*, 2018-Ohio-5242, 117 N.E.3d 10, ¶ 124-125 (4th Dist.).

**{¶78}** Howard argues that her attorney's cumulative errors and failures violated her constitutional rights. However, because none of Howard's individual claims of ineffective assistance has merit, she "cannot establish an entitlement to relief simply by joining those claims together." *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 173 (when defendant failed to establish an ineffective assistance of counsel claim on trial counsel's voir dire technique, failure to object to exhibits and

alleged prosecutorial misconduct, and mitigation investigation or preparation, defendant cannot establish cumulative error "simply by joining those claims together").

**{¶79}** We overrule her second assignment of error.

## C. Extrinsic Evidence to Prove Bias

**{¶80}** For her third assignment of error, Howard contends that, under Evid.R. 616(A), the trial court erred when it barred extrinsic evidence to prove bias of bartender Triplett. The state argues that, based on Howard's argument that her counsel was constitutionally ineffective for failing to make this argument at trial, Howard has forfeited all but plain error and our review should be limited accordingly. However, because we found that the trial court specifically asked Howard's attorney if she was making an argument based on bias under Evid.R. 616(A) and her attorney answered in the affirmative, Howard did make this argument at trial and has not forfeited her right to contest the trial court's evidentiary ruling.

## 1. Standard of Review

**{¶81}** Decisions involving the admissibility of evidence are reviewed under one of two different standards depending upon the type of error:

> "Decisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review." *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032; *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 19 ("It is well established that a trial court's decision to admit evidence is an evidentiary determination within the broad discretion of the trial court and subject to review on an abuse-of-discretion standard."). Thus, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence absent a clear showing of an abuse of discretion with attendant material prejudice to defendant. *State v. Green*, 184 Ohio App.3d 406, 2009-Ohio-5199, 921 N.E.2d 276, ¶ 14 (4th Dist.).
>
> When, however, an appellant alleges that a trial court's evidentiary ruling was " 'based on an erroneous standard or a misconstruction of the law,' "

an appellate court reviews the trial court's evidentiary ruling using a de novo standard of review. *Wray v. Wessell*, 4th Dist. Scioto Nos. 15CA3724 and 15CA3725, 2016-Ohio-8584, 2016 WL 7912885, ¶ 13, citing *Morris* at ¶ 16, quoting *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership,* 78 Ohio App.3d 340, 346, 604 N.E.2d 808 (2d Dist.1992); *accord Estate of Johnson* at ¶ 22 (reviewing admissibility of evidence by first examining whether, as a matter of law, statute applied, and then once threshold question concerning applicability of statute resolved, reviewing whether trial court abused its discretion); *Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, 909 N.E.2d 1237, ¶ 13 (stating that "[w]hen a court's judgment is based on an erroneous interpretation of the law, an abuse-of-discretion standard is not appropriate"); Painter and Pollis, *Ohio Appellate Practice*, Appendix G (2015) (stating that although trial court decisions involving the admission of evidence are generally reviewed as a discretionary matter, but they are subject to de novo review if a clear legal rule applies. "For example, a trial court does not have discretion to admit hearsay into evidence").

*State v. Wright*, 2017-Ohio-9041, 101 N.E.3d 496, ¶ 24-25 (4th Dist.).

## 2. Evidence Rule 616(A): Impeachment by Bias

**{¶82}** Howard argues that the trial court wholly ignored Evid.R. 616(A) which allows extrinsic evidence to be introduced to establish bias and does not require the proponent to first lay a foundation. Although Howard uses the abuse of discretion standard of review in her brief, her contention is that the trial court failed to use the correct evidence rule and misapplied the law by excluding extrinsic evidence of bias based on a lack of foundation. Thus we apply a de novo standard of review.

**{¶83}** Evid.R. 616(A) provides:

In addition to other methods, a witness may be impeached by any of the following methods:
(A) Bias
Bias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence.

Ohio does not require that a foundation be laid as a prerequisite for the introduction of extrinsic evidence of witness bias under Evid.R. 616(A). *See State v. Griffith,* 2015-Ohio-

4112, 43 N.E.3d 821, ¶ 16 (2nd Dist.) "However, like all relevant evidence, evidence of bias or motive to misrepresent is inadmissible pursuant to Evid.R. 403(A) if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or of misleading the jury." *State v. Mathias,* 4th Dist. Gallia No. 91CA31, 1994 WL 116243, *5 (Mar. 31, 1994).

**{¶84}** "The potential for witness-bias represents a significant concern when evaluating a witness's credibility." *State v. Dailey,* 4th Dist. Adams No. 18CA1059, 2018-Ohio-4315, ¶20, citing *State v. Dyer*, 2017-Ohio-8758, 100 N.E.3d 993, ¶ 36 (2nd Dist.). "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' " *State v. Smith*, 2016-Ohio-7566, 76 N.E.3d 551, ¶ 37 (5th Dist.), quoting *Green v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

**{¶85}** Howard's attorney called Stefan Morris and he testified that he was privy to a telephone call between Butch Howard and Triplett. After the jury was excused, Howard's attorney proffered the testimony of Morris concerning the telephone conversation between Triplett and Butch Howard so the trial court could make an admissibility ruling on the matter:

> Q. Um, did – was there a phone cal [sic] that you heard between Nate Triplett and Butch?
>
> [Morris]: Yes, Ma'am.
>
> Q. And when was it?
> * * *
> [Morris]: About three or four days after the incident.
>
> Court: The incident at the bar where a fight occurred?
> [Morris]: When the fight occurred.
> * * *

Q. What did you hear Nate say to Butch?

[Morris]: When Nate asked for my phone, he asked me to call Butch, so I scrolled through my Facebook and hit the camera button and gave him my phone and he stood right there two to three foot away from me talking to Butch and he apologized to Butch for calling him the "N" word –

Court: When, okay, can you tell me exactly what did he say?

[Morris]: He said he was sorry for the altercation that happened I guess before the night at the Cross Keys and he apologized for the way his friends were acting the night at the Cross Keys.
                                                    * * *
Q. Can you say and use all of the actual words and not – I mean, if Aaron or if Nate said I apologize for using the "N" word, that's one thing, but he didn't say "N" word?

[Morris]: No, he wasn't saying "N" word, he said he was just sorry; he was just saying I'm sorry. I apologize.

Court: -- Wait a minute. Hold on. Did he say I apologize for using the "N" word or not?

[Morris]: Yeah, he said he apologized for supposedly using the "N" word and then he apologized about the night in question when the guy got hit in the glass. He apologized for his friends['] actions.

Court: Okay. Okay. Very Well.

Q. Did he say anything else about "You make me nervous to testify"?

[Morris]: Oh, yeah, if he said if you get me some money –
            * * *[Equipment malfunction interruption]

Q. Okay, So did he make any reference to Nate testifying?

[Morris]: He said he wouldn't show up for court if Butch paid him and Butch said he wasn't going to pay him.

{¶86} Howard's attorney argued that Morris's testimony concerning the conversation between Triplett and Butch should be admitted to show Triplett's bias. The trial court found that the proffered testimony could be divided into three separate issues: (1) the apology for the use of the "N" word; (2) apologizing for friends; and (3) the offer of

money concerning testimony. The trial court confirmed again that these were being offered to show bias – Evid.R. 616(A) having been specifically referenced minutes earlier before the proffer.

**{¶87}** However in ruling, the trial court sustained the state's objection on the basis that Howard's attorney did not lay the proper foundation. Howard's attorney attempted to make additional legal arguments but the trial court stopped her, sustained the state's objection, and noted Howard's objections for the record. The court allowed Howard to establish that a telephone call between Triplett and Butch Howard occurred, but not the substance of the conversation.

**{¶88}** Based on our de novo review, we find the trial court erred as a matter of law when it determined that the testimony about the conversation between Triplett and Butch Howard was inadmissible to show bias. According to Morris, Triplett apologized for using a racial slur and for his friends' behavior and offered not to testify in exchange for a monetary payment. This testimonial evidence exposes a racial bias against Howard and a friendship bias in favor of Aaron and Nathan Ray. The offer not to testify against Howard in exchange for money is more nuanced. It implies that Triplett witnessed events that evening, which if testified to in court, would be harmful to Howard's defense. His offer does not necessarily imply that he would go so far as to perjure himself on behalf of Howard, but rather implies a willingness to make himself unavailable to testify in the state's case. More broadly it shows Triplett's willingness to alter his testimony based on financial motivations.

**{¶89}** The state appears to concede that the evidence of Triplett's phone call was admissible to show bias under Evid.R. 616(A), but argues that even assuming this one

mistake, the outcome of the trial would not have differed. The state argues that Nate Triplett's testimony was not the "lynchpin" of the state's case. Instead, the "lynchpin" was the location of the broken glass, which law enforcement officers testified was found ten to fifteen feet into the parking lot, not on the sidewalk next to where the truck had been parked. The jury also had photographic evidence of the location of the broken glass that shows it was in a parking lot and not on the sidewalk where Howard said the altercation occurred.

**{¶90}** We find that although the trial court erred in ruling inadmissible Morris's testimony about the substance of the telephone conversation, we conclude that the trial court's error in excluding this evidence constituted harmless error beyond a reasonable doubt. Under the harmless-error analysis, the state bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 36. The Supreme Court of Ohio set forth a three-part test to determine whether an alleged error affected the substantial rights of the defendant and requires a new trial: "The reviewing court must ascertain (1) whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict, (2) whether the error was not harmless beyond a reasonable doubt, and (3) whether, after the prejudicial evidence is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt." *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 50, citing *Harris* at ¶ 37; *State v. Oldaker*, 4th Dist. Meigs No. 16CA3, 2017-Ohio-1201, ¶ 33; *State v. Ruble*, 2017-Ohio-7259, 96 N.E.3d 792, ¶ 31 (4th Dist.).

{¶91} Even without Triplett's testimony, the location of the broken glass matched Aaron and Nathan Ray's version of events and contradicted the defense witnesses' multiple versions. No glass was found on the sidewalk where Howard claims she hit Aaron Ray. The broken glass was found where Aaron and Nathan Ray testified that Aaron was standing and where Aaron Ray testified that the assault occurred. Howard has no explanation why the broken bloody glass shards were found ten to fifteen feet into the side parking lot and no glass was found on the sidewalk where Howard and Morris claim Aaron was hit and where, according to Morris, the glass shattered so expansively some landed on him.

{¶92} Additionally, the jury could reasonably find the defense witnesses lacked credibility. Morris's and Frazier's written statements had the same incorrect date written in the same left hand corner of the page, were on identical notebooks, were in virtually identical handwriting, and used "tussle" or "tussling" to describe Aaron Ray's struggle with Morris. The jury could reasonably disbelieve Howard's testimony that they were not both written by her and determine that Howard had written the statements herself to create a cohesive defense narrative. At the time the written statements were made, Howard did not know Aaron Ray's name, but Frazier had known him for years. Oddly, in the written statement Frazier's girlfriend transcribed, Frazier only referred to him as "an intoxicated guy" or "the guy." Howard testified that she did not tell the police anything about that evening, yet Officer Elword testified that Howard told him she had a fight with her husband. And Howard insisted that she did not write down Frazier's statement, which appeared to be written in handwriting virtually identical to hers.

{¶93} McMannis testified that, though still ambulatory, she had been drinking alcohol all evening. Her version of events matched no others: The Howards did not have a fight, their truck was parked directly in front of the Crosskeys Tavern's door and Frazier, Morris and Butch Howard all left the bar together.

{¶94} Parts of Frazier's testimony bolstered the credibility of Aaron and Nathan Ray's testimony and undermined his own. Frazier testified that he was standing, smoking a cigarette outside when Nathan Ray approached the loud argument Triplett and Butch Howard were having. Triplett and Butch were yelling so loudly, Frazier could hear it outside but whatever Nathan Ray said could not be heard from outside. This matched Nathan Ray's testimony that he approached Triplett and Butch and asked Triplett if he was okay and that this made Butch angry at him, but he slipped past and out the door. Frazier testified that later Nathan Ray came back to Crosskeys from the direction of the alley – the same route Nathan Ray testified he took to return to Crosskeys Tavern. Frazier testified that Nathan Ray asked him what had happened. If Nathan Ray had been in a group of guys with Aaron Ray trying to fight Butch Howard as McMannis testified, he would not have needed to ask Frazier what had happened. Frazier then undermined his own version of the assault by testifying that he told Nathan Ray "I don't know what exactly happened. I'm not sure." Even if the jury found Frazier credible, Frazier testified that Aaron was being held by Morris when Howard struck him. Morris testified that Aaron Ray had barely left his grasp when Howard struck him.

{¶95} Likewise even if the jury found Frazier's and Morris's written statements credible, neither support Howard's self-defense theory. Aaron Ray was standing in front of the truck and as long as he was standing there the Howards were not able to leave.

According to Frazier's written statement, "I noticed an intoxicated guy [Aaron Ray] standing in front of Butch's truck * * * I told the guy to get out of the street he's [Butch] trying to leave." This implies Aaron Ray was drunk and standing in the street, oblivious to the Howards.  Morris tried to physically move Ray from his location by pushing and/or physically carrying him and during that "tussle" Ray was hit.  "Tussle" is the word that both Frazier and Morris independently and separately dictated to Frazier's girlfriend and Howard, respectively, to describe Aaron Ray's struggle with Morris and it is also the word Howard herself used repeatedly during her trial testimony.

{¶96} Frazier's written statement was that Aaron Ray was *trying* to get away from Morris and was hit. Morris's written statement was that Aaron Ray was struggling and swinging, *trying* to get away to get Butch and was hit. Neither statement says that Aaron Ray broke free, ran towards Tyarria Howard yelling threatening obscenities, and was hit.

{¶97} Finally, the jury was already aware that Triplett and the Rays were friends, had gone to high school together, and had been on the high school wrestling team together. Therefore the evidence of friendship bias was already before the jury. During the state's case in chief, Howard's attorney cross-examined Triplett and asked, "About a month before this incident, you called Butch a nigger and got sent home? * * * you used Stephon's [Stefan] phone to call Butch after this incident? * * * And you apologized to Butch?"  Although Triplett denied it, the jury was aware of the allegation, at least, that Triplett had used a racial slur and later telephoned to apologize for it.

{¶98} The trial court's error in excluding Morris's testimony about the substance of the telephone call did not affect the outcome of the trial; the remaining evidence

establishes Howard's guilt beyond any reasonable doubt. We overrule Howard's third assignment of error.

## IV. CONCLUSION

**{¶99}** Howard has not established any reversible error. Having overruled her assignments of error, we affirm her conviction for felonious assault.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
Michael D. Hess, Judge

### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**